BIOSYNTEC, INC., an Oregon corporation, and the University of Virginia Alumni Patents Office, a Virginia corporation, Plaintiffs,

v.

BAXTER HEALTHCARE CORPORATION, a Delaware corporation, and Sisters of Providence in Oregon, dba St. Vincent Hospital and Medical Center, Defendants.

Civ. No. 90–599–FR.

United States District Court,
D. Oregon.

Sept. 28, 1990.

**6**

Roger L. Meyer, Agnes Sowle, Meyer, Habernigg & Wyse, Portland, Or., for plaintiffs.

David P. Roy, Rappleyea, Beck, Helterline & Roskie, Portland, Or., for defendants.

## OPINION

FRYE, Judge:

The matters before the court are:

1. the motion of defendant Baxter Healthcare Corporation (Baxter) to dismiss for improper venue the action of plaintiff Biosyntec, Inc. (Biosyntec) and involuntary plaintiff the University of Virginia Alumni Patents Office (UVA), in which Biosyntec and UVA allege patent infringement (# 8–1);

2. Baxter's motion for summary judgment (# 8–2); and

3. the stipulation by the parties that defendant Sisters of Providence in Oregon, dba St. Vincent Hospital and Medical Center, be dismissed.[1]

## BACKGROUND

This case involves a claim of patent infringement. Baxter is a Delaware corporation with its principal place of business in the State of Illinois. Baxter also maintains an office in Wilsonville, Oregon and conducts business with Oregon customers. Biosyntec is an Oregon corporation with its principal place of business in Beaverton, Oregon. Involuntary plaintiff, UVA, is a Virginia non-profit corporation with its principal place of business in Charlottesville, Virginia.

The patent at issue was granted on February 13, 1979 to Deknatel, Inc. (Deknatel) for an invention of Leonard D. Kurtz entitled "Method of Cleansing Contaminated Wounds." United States Reissue Patent No. 29,909. On May 1, 1980, Deknatel and its patent rights were sold to Howmedica, Inc. (Howmedica), a Delaware corporation. Howmedica assigned the patent to the Kurtz family on May 1, 1980. On March 1, 1981, the Kurtz family granted Biosyntec

1. A stipulation of dismissal under Rule 41(a)(1) was filed with the court on September 17, 1990.

an exclusive license under the patent to manufacture and sell products for use as surgical scrub solutions. On March 1, 1981, the Kurtz family assigned ownership rights in the patent to UVA subject to the license granted to Biosyntec.

Pursuant to its rights under the license, in mid–1981, Biosyntec began to manufacture, market and sell a product which it called SHUR–CLENS, whose use as a surgical scrub solution came within the claims of the patent. In approximately March, 1986, Biosyntec completed negotiations for the sale of the license to Calgon Corporation (Calgon). The sale was scheduled to close on May 31, 1986 for a purchase price of $425,000.

On or about May 20, 1986, Biosyntec and Calgon learned that Baxter was manufacturing and selling a surgical scrub solution which it called PHARMA–CLENS. Biosyntec and Calgon believed that the manufacture and sale of this product by Baxter was an infringement of Biosyntec's license under the patent. On May 20, 1986, Biosyntec advised Baxter of its exclusive license and demanded that Baxter halt the manufacture and sale of PHARMA–CLENS. Baxter did not honor this demand.

By an agreement of sale dated October 9, 1986, Calgon finalized its purchase of Biosyntec's license under the patent. Both parties were aware of the possibility of a claim for infringement against Baxter; however, the agreement of sale made no express provisions regarding rights to this claim. Calgon subsequently joined with the patent owner, UVA, in bringing a suit alleging patent infringement against Baxter in the United States District Court for the Eastern District of Virginia. The lawsuit was settled pursuant to a settlement and release agreement dated May 4, 1989. Under the settlement and release agreement, Baxter agreed not to sell PHARMA–CLENS, and Calgon and UVA released Baxter and its customers from any and all claims of infringement arising on or before the date of the settlement and release agreement. Settlement and Release Agreement, pp. 2, 3.

Biosyntec held its license until on or about October, 1986. UVA held its title and ownership rights until at least October, 1986.

## CONTENTS OF THE PARTIES

1. *Baxter's Motion to Dismiss for Improper Venue*

Baxter argues that venue in patent infringement cases is governed exclusively by 28 U.S.C. § 1400(b), which provides that "[a]ny civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business," and that the United States Supreme Court has interpreted the term "resides" as it applies to a corporate defendant within the context of this statute to mean the place of the defendant's incorporation. *Brunette Mach. Works, Ltd. v. Kockum Indus., Inc.*, 406 U.S. 706, 707 n. 2, 92 S.Ct. 1936, 1937 n. 2, 32 L.Ed.2d 428 (1972). Thus, Baxter argues, under section 1400(b), a claim of patent infringement against a corporate defendant can be brought only in the state where the defendant was incorporated or in the state where the defendant committed the acts of infringement and had a regular place of business. Baxter contends that because it was not incorporated in the State of Oregon and it has not committed acts of infringement in the State of Oregon, venue in this district is improper under section 1400(b).

Biosyntec argues that 28 U.S.C. § 1391(c), as amended in 1988, provides a basis for venue in this district. Biosyntec bases this argument on the first clause of 28 U.S.C. § 1391(c) which provides: *"For purposes of venue under this chapter, a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced."* (Emphasis added). Section 1400 and section 1391 are both contained in Chapter 87 of the United States Code. Biosyntec reasons that the first clause in section 1391(c) supersedes any previous special venue requirements under section 1400(b). Biosyn-

tec contends that by construing section 1400(b) with the amended section 1391(c), venue in this district is proper. Baxter is subject to the personal jurisdiction of this court because it conducts business in the State of Oregon.

## 2. *Baxter's Motion for Summary Judgment*

Baxter offers three arguments in support of its motion for summary judgment. Baxter argues that 1) this suit is barred by the failure of Biosyntec to adhere to a provision in its license agreement with UVA which requires Biosyntec to provide UVA with written notice of claimed infringement and to give UVA ninety days after receipt of such notice to eliminate the infringement before Biosyntec proceeds with a suit on its own behalf[2] (License Agreement, pp. 3, 4); 2) Biosyntec assigned any right it had to bring suit against Baxter to Calgon under the Biosyntec–Calgon agreement of sale of October, 1986; and 3) the claim of Biosyntec is barred by the settlement and release agreement executed by UVA, Calgon and Baxter on May 4, 1989.

Biosyntec argues that the license agreement it had with UVA is permissive rather than mandatory with respect to notifying UVA of claimed infringement. Biosyntec also contends that because Baxter was not a party to the license agreement it cannot use the terms of that agreement in its defense. Biosyntec claims that its suit against Baxter is not barred by the terms of the settlement and release agreement between UVA, Calgon and Baxter because Biosyntec was not a party to the settlement and release agreement, was not mentioned in the settlement and release agreement, had no knowlege of the terms of the settlement and release agreement, and had no opportunity to negotiate the terms of the settlement and release agreement.

## ANALYSIS AND RULING

### 1. *Baxter's Motion to Dismiss for Improper Venue*

■ Chapter 87 of the United States Code governs venue in the United States District Courts. 28 U.S.C. §§ 1391 *et seq.* Prior to its amendment in 1988, 28 U.S.C. § 1391, entitled "Venue generally," provided in part: "A corporation may be sued in any judicial district in which it is incorporated or licensed to do business or is doing business, and such judicial district shall be regarded as the residence of such corporation for venue purposes." 28 U.S.C. § 1391(c) (1976).

For many years, 28 U.S.C. § 1400(b) (which is also contained within Chapter 87) was viewed as an exception to the general venue requirements of section 1391 and was held to be the exclusive provision governing venue for patent infringement actions. *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 229, 77 S.Ct. 787, 792, 1 L.Ed.2d 786 (1957). Section 1400(b) provides that a civil action for patent infringement may be brought in either the judicial district where the defendant resides or where the defendant committed acts of infringement and has a regular and established place of business. For the purposes of establishing venue under section 1400(b), a corporation was considered to reside only in its state of incorporation. *Brunette Mach. Works, Ltd. v. Kockum Indus., Inc.*, 406 U.S. 706, 707 n. 2, 92 S.Ct. 1936, 1937 n. 2, 32 L.Ed.2d 428 (1972).

In 1988, Congress amended 28 U.S.C. § 1391(c) so that it now reads: "*For purposes of venue under this chapter,* a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." (Emphasis added). Baxter asserts that despite the clear wording of the amendment, section 1400(b) remains an exception to the general venue provisions and is the sole provision governing venue in patent infringement cases.

Four district courts have considered this question. Two have held that section 1400(b) is exempt from the amendment; *Joslyn Mfg. Co. v. Amerace Corp.*, 729 F.Supp. 1219 (N.D.Ill.1990); and *Doelcher*

---

**2.** Biosyntec did not provide UVA with notice of this suit until June 13, 1990.

*Prods., Inc. v. Hydrofoil Int'l, Inc.*, 735 F.Supp. 666 (D.Md.1989), and two have held that the amendment expands venue alternatives in patent infringement cases; *Century Wrecker Corp. v. Vulcan Equip. Co.*, 733 F.Supp. 1170 (E.D.Tenn.1989); and *Regents of the Univ. of Calif. v. Eli Lilly and Co.*, 734 F.Supp. 911 (N.D.Cal.1990).

The legislative history indicates that one reason Congress amended section 1391(c) was to clarify the issue of venue for a corporate defendant in a state with multiple judicial districts. However, the legislative history makes no reference to an intent to exclude section 1400(b) from the effect of the amendment. Absent the clearly expressed legislative intent to the contrary, the language of the statute itself must ordinarily be regarded as conclusive. *United States v. James*, 478 U.S. 597, 606, 106 S.Ct. 3116, 3121, 92 L.Ed.2d 483 (1986). The plain wording of section 1391(c) as amended provides that the definition of "resides" contained therein applies to all of the venue provisions found in Chapter 87 of Title 28 of the United States Code, including section 1400(b). *Regents of the Univ. of Calif. v. Eli Lilly and Co.*, 734 F.Supp. 911, 913 (N.D.Cal.1990). Baxter does business in the State of Oregon and therefore was subject to personal jurisdiction in this district at the time this suit was commenced. The court holds that under 28 U.S.C. § 1391(c) as amended, venue in this district is proper.

2. *Baxter's Motion for Summary Judgment*

Biosyntec's rights under the patent are governed by three separate agreements: the agreement relating to the transfer and sale of Biosyntec's license to Calgon, the original license agreement between Kurtz and Biosyntec which was later assigned to UVA, and the settlement and release agreement between UVA, Calgon and Baxter.

In March, 1986, Biosyntec gave Calgon an option to purchase its exclusive rights to the manufacture and sale of SHUR–CLENS. The option extended until May 31, 1986. Biosyntec and Calgon both learned of the existence of a potential claim against Baxter for infringement of the patent on May 20, 1986. The sale of the license rights of Biosyntec to Calgon was finalized on October 9, 1986, over four months after Biosyntec became aware of Baxter's possible infringement. Although the language of the agreement of sale is specific as to the procedure for payment in case of a challenge to the patent, the agreement of sale is silent as to any reservation of right by Biosyntec to bring suit against Baxter.

 Under the heading "General Provisions," the agreement of sale provides: "There are no agreements, warranties or representations, express or implied, except those expressly set forth herein." (Agreement of Sale, p. 8). The agreement of sale expressly sets forth the terms of the sale of Biosyntec's rights in its exclusive license under the patent to Calgon. It further provides that Calgon agrees to perform all obligations of Biosyntec under the license agreement. The language of the agreement of sale accomplishes a complete assignment to Calgon of the rights and obligations of Biosyntec under its license. Article V of the Biosyntec/Kurtz license agreement sets forth one of those rights as the right to bring suit for claimed infringement. Under the plain language of the agreement of sale, Biosyntec transferred this right, along with all other rights and obligations under the license, to Calgon. *See Maguire Indus. v. Harrington & Richardson Arms Co.*, 79 F.Supp. 81 (D.Mass. 1948).

 Even if Biosyntec had retained the right to bring suit against Baxter in its agreement of sale with Calgon, that right would still be governed by the provisions of Biosyntec's license from UVA. A licensee has no right to sue an alleged infringer in its own name, but must sue in the name of the licensor who has title to the patent. *Independent Wireless Tele. Co. v. Radio Corp. of Am.*, 269 U.S. 459, 468, 46 S.Ct. 166, 169, 70 L.Ed. 357 (1926). Any right which Biosyntec had to sue Baxter was subject to the terms under which UVA granted an exclusive license to Biosyntec

because the rights of Biosyntec are derived from the rights of UVA. *Id.* The license agreement between Biosyntec and UVA provides, in relevant part:

Licensors agree to and hereby grant unto Biosyntec exclusive license with the right to grant sublicenses to make, use and sell Products for use as surgical scrub solutions as claimed in or otherwise protected by the patents.

License Agreement, Article I(a), p. 1.

Licensors have no knowledge of any existing or threatened infringement of the patents described herein. If during the continuance in force of this Agreement, Biosyntec notifies Licensors that any United States Letter Patent coming within the agreement is being infringed and furnishes Licensors with evidence constituting reasonable proof of such infringement and such infringement is material, Licensors shall have ninety (90) days after written notice from Licensee within which to commence legal action to eliminate such infringement. In the event Licensors fail to institute such legal action, then Biosyntec shall have the right to bring such action at its own expense.

License Agreement, Article V, pp. 3–4.

█ Biosyntec contends that under the license agreement, it has the option to notify UVA prior to bringing a suit for infringement on its own behalf. Baxter contends that the correct interpretation of the license agreement is that Biosyntec is required to notify UVA before bringing suit. The plain language of the license agreement, that Biosyntec must notify UVA prior to bringing a suit, is mandatory rather than permissive. The word "if" in the language quoted above refers not to optional notification, but to the occurrence of a potential infringement claim. The subsequent provision allowing UVA ninety days to act after such notification clearly indicates that Biosyntec has no right to bring suit prior to the expiration of this period. Only this interpretation is consistent with the derivative nature of Biosyntec's rights under the patent. Biosyntec did not notify UVA ninety days before filing this suit. Biosyntec has not complied with the conditions of the license agreement and has no right to bring suit on its own behalf.

Finally, because the rights of Biosyntec under the patent are derivative of the rights of UVA as the patent owner, Biosyntec is also subject to the terms of the settlement and release agreement between UVA, Calgon and Baxter, which states in part:

4. CALGON and U. VA. agree to dismiss, within ten business days of the effective date of this agreement, Civil Action No. 89–0278–A, without prejudice and further agree not to pursue any civil action against BAXTER or its customers for damages arising from the sales of BAXTER's Wound Cleansing Products prior to the effective date of this agreement.

. . . .

7. CALGON and U. VA. hereby release BAXTER and its customers from any and all claims of infringement arising from the manufacture, use or sale of Wound Cleansing Products on or before the date of this Agreement. . . .

. . . .

This document constitutes the entire agreement between the parties hereto. . . . There are no understandings, representations, or warranties except as expressly set forth herein.

Settlement and Release Agreement, pp. 2–3.

█ A release by a patentee for past infringement by a stranger generally operates to discharge any claims by an exclusive licensee as to such infringement. *E.I.S. Mfg. Co. v. Supco Prods. Corp.*, 26 F.Supp. 758, 761 (S.D.N.Y.1938). Even if Biosyntec had retained a right to sue Baxter under the agreement of sale with Calgon and had complied with the notification requirements of its license from UVA, Biosyntec's suit would be barred by UVA's settlement and release agreement with Baxter.

█ UVA, as owner of the patent right, released Baxter from all claims of infringement arising under the patent prior to May 4, 1989, the date of the settlement and release agreement. This included a release of any claims arising during the term in which Biosyntec was the exclusive licensee.

UVA no longer has a right to bring suit against Baxter for infringement during this period. Since Biosyntec's rights are derived from UVA's rights, Biosyntec's suit is also barred. If Biosyntec has any claim, it is against UVA for some portion of the money it received in the settlement with Baxter.

The court holds that Biosyntec's suit against Baxter is barred by each of the three agreements which control this dispute. Biosyntec transferred any rights it might have had to a claim against Baxter in the sale of its exclusive license to Calgon. Even if Biosyntec had retained the right to make a claim, it failed to notify UVA as required by its license and was never vested with the right to bring suit in its own name under the terms of that license. Finally, Biosyntec's suit is barred by the release given to Baxter by UVA, the patent owner. UVA's voluntary discharge of its claims against Baxter is binding as to Biosyntec because of the derivative nature of Biosyntec's rights.

### CONCLUSION

Baxter's motion to dismiss for improper venue (# 8–1) is denied. Baxter's motion for summary judgment (# 8–2) is granted.